MINOT (WAGENER v.). See Case No. 17,-033.

MINOT (WESTON v.). See Case No. 17,453.

MINTURN (BROWN v.). See Case No. 2,021.

## Case No. 9,646.

### MINTURN v. LARUE et al.

[1 McAll. 370.][1]

Circuit Court, N. D. California. July Term, 1858.[2]

FERRY—STATUTORY RIGHT—POWERS BY IMPLICATION—MONOPOLY.

1. Equity will protect by injunction a statutory right, where the title of complainant is free from doubt.

2. Where the legislature has granted the franchise of constructing and keeping a ferry, no powers will be construed to have been given by implication, unless of a direct character. None not so derived will be conceded, except by the express language of the law.

3. A monopoly will never be awarded except by implication of a most direct and immediate character, and as necessarily annexed to powers expressly granted.

[Cited in State v. Black River Phosphate Co., 32 Fla. 82, 13 South. 648.]

The bill in this case was filed praying for an injunction to restrain the defendants [Larue and others] from infringing upon an alleged exclusive franchise of the complainant in a ferry between the town of Oakland and the city of San Francisco.

Hoge & Wilson and E. W. F. Sloan, for complainant.

Gregory Yale and Crockett, Baldwin & Crittenden, for defendants.

McALLISTER, Circuit Judge. The bill in this case is exhibited in behalf of Edward Minturn, a citizen of the state of New York, who alleges himself to be the proprietor of a ferry established across the Bay of San Francisco, with its termini at the town of Oakland and the city of San Francisco. The bill prays for an injunction against the defendants, who, it is alleged, are infringing the exclusive privileges which complainant claims to hold in the said ferry. A motion is made upon the bill and affidavits filed by both parties, for the issue of the writ prayed for. In the affidavits of both parties are introduced matters collateral to the merits, and

[1] [Reported by Cutler McAllister, Esq.]
[2] [Affirmed in 23 How. (64 U. S.) 435.]

which cannot be subjects of legitimate consideration in the discussion of this case. Instead of being distinct affirmations or denials of facts material to the issue, they are argumentative, denunciatory, and partake more of the character of written discussions, than of sworn statements of facts constituting the true merits of the cause. Perhaps the appropriate course would have been for the court to have suppressed them as tending to introduce confusion, and constitute a dangerous precedent in the practice of a court of chancery. But as neither party moved for their suppression, content with calling the attention of the court to the character of these documents, it was agreed by both parties that the affidavits should be read; the propriety of the admission of them, or portions of them, discussed on the final argument of the motion, and the disposition of them left to the court. Now, there is a large proportion of these documents the court feels bound to discard from its consideration. Whether the charter of the town of Oakland was obtained by fraudulent practices from the legislature of this state? Whether the ordinance of the trustees of the town of Oakland, passed for the establishment of the ferry, was the result of conspiracy? Whether the contract between the town of Oakland and Carpentier, the assignor of complainant, was the offspring of fraudulent connivance? Whether the ferry has been so grossly mismanaged as to constitute an imposition on the public? Whether the proprietorship of the ferry has been a source of profit or not? Whether all good citizens demand that the monopoly of complainant should be arrested? Whether public opinion among the citizens of Oakland emphatically requires it to be done? These matters, and all akin to them which have been embodied in the affidavits, or directly intimated in them, must be disregarded, and this case decided by an application of well-settled legal principles to the issue made. The complainant asks for the extraordinary interposition of this court for the protection of what he considers a legal statutory right; and if given, it must be by the application of principles, independent of all other considerations. He claims as assignee of one Charles Minturn, himself the assignee of one Edward R. Carpentier, who is the alleged grantee of the ferry from the town of Oakland.

The defendants, independently of the defects alleged by them to exist in the title of the complainant, set up by way of defense, a claim under a direct transfer to them of the premises in dispute, from the town of Oakland, subsequent in date to the assignment to complainant by Charles Minturn. They also set up as a defense, the fact, that the steamer they are running has been duly licensed and enrolled for the coasting trade, under the laws of the United States, and as such is entitled to navigate the waters of the Bay of San Francisco. In the view the court

entertains of this case, it will be unnecessary to investigate the character of this latter defense. The complainant Minturn, contends that the documentary title exhibited, vested in him an exclusive privilege to the ferry for the term of twenty years from the date of the contract between the town of Oakland and the said Carpentier. That such contract, under which he claims, vested in him such an interest as excludes any one from the right to run a boat on the route between the city of San Francisco and the town of Oakland, and concludes the town of Oakland from conferring on any one the right to do so during the period of time said contract shall exist. He further contends, that he has exhibited a prima-facie case, and that it entitles him to an injunction; that the court will not look to the extent and validity of the complainant's title, but postpone the consideration of them to a future stage of the case. There is a class of cases where the court will, although not satisfied with, but entertaining doubt as to the complainant's title, grant an injunction forthwith, before answer. But this is done to prevent irreparable mischief. Where the injury sought to be enjoined, is the transfer of negotiable paper by an irresponsible party; a destructive trespass to the inheritance; the repetition of a nuisance, or the commission of some act not reparable in damages, the court ex necessitate will order an injunction to keep the parties in statu quo until its doubts have been removed by the facts elicited in the future investigation of the cause. This is not such a case. The title of the complainant is set forth in his documentary proof; and all the materials for its investigation by ascertaining their legal effect, are before the court. It involves no inquiry into complicated facts. It depends alone upon the construction of the charter which gave it birth. Why should the court decline to pass upon it, but postpone the investigation into the construction of it, intermediately enjoining the adverse party from running their boat?

The complainant asks for an injunction to enjoin from the alleged infringement of what he claims to be his statutory right. Now, the power of this court to interpose, depends upon the fact that his right is clear and without doubt, his possession actual, and when his legal title is not put in doubt. 1 Johns. Ch. 611. In Livingston v. Van Ingen, 9 Johns. 585, Chancellor Kent says, "Injunctions are always granted to secure the enjoyment of statute privileges of which the party is in the actual possession, unless the right be doubtful." The same doctrine, that before the court will interfere by injunction the right of the complainant should be free from doubt, is enunciated by Savage, C. J., in North River Steamboat Co. v. Livingston, 3 Cow. 755. It may be therefore assumed that the right of the complainant must be legal, clear, and beyond reasonable doubt. The question, then, into its validity and ex-

tent becomes not only a necessary but preliminary inquiry to the issue of an injunction.

Now, the source of complainant's title is to be found in the charter of the town of Oakland. He claims under assignment from Edward B. Carpentier, grantee of that town. No interest could pass from the latter to its grantee save what was vested in it by its charter, and none other could pass from it to the grantee under whom complainant claims, whatever may be the terms of the instrument executed by them. As to the character of this interest it must be that of a vested interest, or property; or it is a franchise; or lastly, it may be termed, as characterized by one of the solicitors for the complainant, "a legislative power." The decisions of the New York courts upon the interest conveyed to the city of New York in the ferries which cluster around it, are based upon the transfers made of them to it by the old charter of the British crown, and the legislature, from time to time, of the state of New York. These transfers are alienations containing all the operative words of conveyance known to deeds transferring the fee in real estate; and their legal effect is fixed by well settled principles. Those New York decisions can, therefore, afford no proper guide in the construction of the Oakland charter. In fact it was not contended in the argument that any property in the ferry was vested in the town of Oakland by its charter, as was the case in New York. One of the solicitors for complainant contended that although no property was conveyed, a franchise was transferred; and the other affirmed that something more than a franchise passed, and termed it a "legislative power." The court considers it a mere naked, incorporeal right. It is created by law; exists only in contemplation of law. It is invisible, intangible, and incapable of a physical possession, and depends on the law for its protection. 2 Gray, 27. But whatever be the interest that passed, its nature and extent must be ascertained in order to see if the title of complainant be so free from doubt as to authorize the court to interfere by injunction. The charter of Oakland is a public grant for the establishment and regulation of ferries across navigable streams, is a subject within the control of government, and is not matter of private right. In the construction of such a grant, designed by the sovereign power making it to be a general benefit and accommodation to the public, the rule is, that if the meaning of the words be doubtful they shall be taken most strongly against the grantee and for the government, and therefore should not be extended by implication beyond the natural and obvious meaning of the words, and if these do not support the right claimed, it must fall. Mills v. St. Clair Co., 8 How. [49 U. S.] 569. In such a grant nothing passes but what is granted in clear and explicit terms. And neither the right of taxa-

tion, nor any other power of sovereignty which the community have an interest in preserving undiminished, will be held by the court to be surrendered unless the intention to surrender is manifested by words too plain to be mistaken. Ohio Life Ins. Co. v. Debolt, 16 How. [57 U. S.] 435. In Beaty v. Lessee of Knowler, 4 Pet. [29 U. S.] 168, the court say, "That a corporation is strictly limited to the exercise of those powers which are specifically conferred on it, will not be denied."

In the Charles River Bridge Case, 11 Pet. [36 U. S.] 548, it is said "when" a corporation alleges that a state has surrendered for seventy years its power of improvement and public accommodation in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist in the language of this court above quoted "that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear." In that case the principle was applied to the charter given, to the proprietors of a bridge, by the state of Massachusetts. The court say in relation to the charter, "It is in the usual form, and the privileges such as are commonly given to corporations of that kind. It confers on them the ordinary faculties of a corporation for the purpose of building the bridge, and establishes certain rates of toll which the company are authorized to take. . . . There is no exclusive privilege to them. . . . No engagement from the state that another shall not be erected; and no undertaking not to sanction competition, nor to make improvements that may diminish the amount of its income. Upon all these subjects the charter is silent, and nothing is said in it about a line of travel, so much insisted on in the argument, in which they are to have exclusive privileges. No words are used from which an intention to grant any of these rights can be inferred. If the plaintiff is entitled to them it must be implied simply from the nature of the grant, and cannot be inferred from the words by which the grant is made. . . . All the franchises and rights of property enumerated in the charter, and there mentioned to have been granted to it, remain unimpaired. But its income is destroyed by the Warren bridge, which, being free, draws off the passengers and property which would have gone over it and renders their franchise of no value. This is the gist of the complaint. . . . In order, then, to entitle themselves to relief, it is necessary to show that the legislature contracted not to do the act of which they complain, and that they impaired, in other words violated, that contract by the erection of the Warren bridge." The court then proceed to decide that no contract of the kind arose out of the words of the charter, and consequently by the erection of the Warren bridge no violation of any contract made with the pro-

prietors of the existing bridge had taken place. [Charles River Bridge v. Warren Bridge] 11 Pet. [36 U. S.] 549.

The case of Fanning v. Gregoire, 16 How. [57 U. S.] 524, is an instructive one on this point. The complainant stated that he had been authorized by an act of the state legislature, framed in 1838, to establish and keep a ferry for the term of twenty years, and that by the terms of the act it was provided that no court or board of commissioners should authorize any other person to keep a ferry within the limits; and the bill prayed for an injunction against the defendants. These latter defended on the ground, that under a contract made with the city of Dubuque, within the limits of which the ferries were situated, they (the contract bearing date in 1852) were running their boat, which did not interfere with the right of the plaintiff other than such interference as is the necessary result of a fair competition. It was contended by complainant that the privilege conferred on him was exclusive; that the right had been given to him and his heirs for twenty years; that an ordinary license is not granted to a man and his heirs; that it was provided in the act "that no court or board of county commissioners shall authorize any other person (unless as is hereinafter provided by this act) to keep a ferry within the limits of the town of Dubuque." In reply to all this the court decided that the grant to complainant was not exclusive. As to the last suggestion of complainant the court say, "The prohibition on a court and the board of county commissioners to grant a license for another ferry, it is urged would show an intent to make the grant exclusive. And that the reason for this might be found in the alleged fact that when the ferry was first established a considerable expenditure was required and little or no profit was realized for some years." But all the judges present, except one, held that the grant was not intended to be exclusive. In that case the court below had refused the injunction and dismissed the petition, and the judgment was affirmed by the supreme court. [Fanning v. Gregoire] 16 How. [57 U. S.] 533.

The case of Thacher v. Dartmouth Bridge, 18 Pick. 501, is a strong illustration of this doctrine. The act of incorporation under which defendants were authorized to erect their bridge did not provide any mode of ascertaining or paying the damage which any individual owner of land might sustain by the appropriation of his property. It was urged by defendants that without the exercise of such power the bridge could not be erected. But the court considered the consent of owners might be obtained by gift or purchase; at all events it would not give the power by implication. It deemed that where the legislature, in the exercise of high sovereign power, intended to confer such a power upon a corporation, they do it in express terms, or by necessary implication. It

is not to be presumed that such a power is intended to be granted unless the intent to do so can be clearly discovered in the act itself. In the present case there is no such power in terms, and we think there is none by implication. Id.; [Fanning v. Gregoire] 16 How. [57 U. S.] 534.

The foregoing authorities establish the canons of construction that must be applied to the charter of Oakland.

As to its language. The clause in it on which complainant relies gives to the trustees of Oakland power to do many things, and among them power "to lay out, make, open, widen, regulate and keep in repair all streets, roads, bridges, ferries, public grounds and places, wharves, docks, piers, sewers, wells and alleys, and to authorize the construction of the same; and with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid between high tide and the channel, are hereby granted and released to said town." The first observation to be made on this charter may be embodied, mutatis mutandis, in the language of the supreme court of the United States, in the case already cited [Charles River Bridge v. Warren Bridge] 11 Pet. [36 U. S.] 545. It (the charter) confers on them the ordinary facilities for the purpose of constructing a ferry. There is no exclusive privilege which they are entitled to bestow. There is no engagement from the state, that another ferry should not be erected. Nor is there an undertaking not to sanction competition, nor to make improvements that may diminish the amount of the income of any ferry that might be constructed. Upon all these subjects, the charter is silent. If the plaintiff is entitled to them, it must be implied from the nature of the grant, and cannot be implied from the words by which the grant is made. All the franchises, and rights of property in the charter mentioned, is the right of constructing ferries, and still remain. But its income is destroyed, or diminished, by the additional facilities afforded by defendants, for transportation and travel. This is the gist of the complaint. In order to entitle plaintiff to relief, it is necessary to show that the legislature in this charter contracted not to do the act he complained of, or that the town of Oakland was authorized to make the contract; or, in other words, that the contract has been violated. The foregoing language of the supreme court, U. S. (with slight alterations), settles the principle that the complainant can only obtain relief on a contract; that none such arose out of the words of the act of the legislature, and it could not be raised by implication from the nature of a public grant. But again, the manner in which the legislature uses terms of conveyance, shows that they had an understanding of their legal effect. When they propose to convey certain lands described, they indicate their intention by using the operating words of "grant and release;" when

they propose to confer certain municipal franchises, they state simply that the power to exercise them is conferred upon the town.

It is urged, that the delegation of a power to make, regulate, and construct ferries, gives an implied power to create exclusive privileges; and it is pressed as a reason for this implication, that at the first construction of the ferry, it demanded a large expenditure, and was for a long time a source of little profit. We have seen that in a public grant, no inference can be made from the supposed nature of the grant, and that if the right of plaintiff is not sustained by clear and obvious words, in the language of Chancellor Kent, "without doubt," the right must fall. A similar argument as to original cost was raised in the case of Fanning v. Gregoire, 16 How. [57 U. S.] 524, and was not deemed entitled to consideration. When the ordinary power of constructing ferries across the navigable waters of the bay, in any direction from Oakland, was conferred on its authorities, it would be a violation of the rules of construction of public grants, to decide that the legislature intended to confer their whole power upon the corporation, and thus preclude themselves from all future opportunities of public improvement. It cannot be considered that the power to grant exclusive privileges to an individual, for nearly a quarter of a century, is to be regarded as belonging to the town by implication. This would be a most extraordinary construction, when we regard the uniform policy of this state, from the earliest law regulating ferries, as manifested upon the statute-book. Anterior to 1855, the regulation of ferries was confided to the courts of sessions. The supreme court of this state having decided that the law conferring the power upon those tribunals was unconstitutional, the legislature committed the power to supervisors.

It is contended that the laws prior to 1855 being unconstitutional, the grant to the town of Oakland cannot be considered as made in subordination to those general laws, and is free from their restrictions. This may be true; still, when we look to the character of these laws, they stand on the statute-book, and serve to show the restrictive and cautious policy of the legislature in relation to ferries. They were only authorized to be established for a short period of time, under various restrictions; and, in no instance did the legislature exclude themselves from establishing additional ones, when public convenience should require it. This uniform policy of our legislature is to be kept in view, when the question arises whether, in the absence of express words and obvious natural language, it is to be presumed to have departed from such policy, and to have bestowed on the town of Oakland the right to grant exclusive privileges, and thus preclude all future intervention on the part of the legislature, even over waters navigable to the ocean. The legislature could not have sup-

posed they had done so when, in less than twelve months afterwards, they passed an act in relation to ferries, in which they repealed the second section of the act creating public ferries, passed 18th March, 1850, as applied to certain bays (among them that of San Francisco), within the limits of the state or their shores, and repealing so much of said section as could be so construed; and enacting that the navigation of said bays, and the transportation of freight or passengers across, through, and over the same, should be free and exempt from the restriction of any ferry-laws now in force in this state. That the legislature had the right to keep the navigation of the bay within the limits of the state, and the transportation across them free and exempt from the restriction of any ferry-laws in force, we think cannot be doubted. For this court to interpose by an injunction to restrain parties from navigating across the Bay of San Francisco, on the ground that they were infringing upon the exclusive privileges of a ferry, in the face of a statute of the state which declares that such bay shall be exempt from all ferry restriction, would be an improper exercise of power.

It is urged that, admitting it was in the power of the legislature to alter, modify, or take back the administrative-legislative power conferred by the charter, still, when private rights have issued out of the exercise of such power by the town of Oakland, they cannot be affected by the repealing action of the legislature. This view assumes that the contract between the town of Oakland and Carpentier, did invest him with a property in the ferry, and legally transferred to him an exclusive right for twenty years. The authorities cited, and the reasoning predicated upon them, tend to show that nothing but a legislative or administrative power was transferred, and that limited to the ordinary construction of a ferry, not authorizing the authorities of Oakland to give a monopoly of it to any one. Such contract, therefore, could not pass such exclusive privileges to a private individual as would paralyze any future action of the legislature. That private rights might arise from the legitimate exercise, by the town of Oakland, of its corporate privileges, there is no doubt; and the repeal of those privileges by the legislature might not affect those rights. To illustrate, the charter gives to the town of Oakland the power of selling or otherwise disposing of its common property. In the exercise of that corporate right, private rights might arise, and a subsequent repeal by the legislature of the corporate privileges of the town, would not defeat the previously vested private rights of the individual. So far from such right having vested in Carpentier, under the contract between him and the town of Oakland, even if the latter had made a grant of the ferry with covenants for the exclusive enjoyment of the franchise granted, this would not have restricted them from exercising the power con-

ferred on them by the charter to construct additional ferries. Such authority was vested in them as trustees for the public, and cannot be restrained by the covenant of the city. In constructing ferries, the authorities of Oakland were acting under a statute in the exercise of which the public had an interest. The city of Oakland was not the owner of the ferry, nor of an exclusive franchise; and although it may have granted it with a covenant for quiet enjoyment, and might be responsible on such covenant to the grantee, still, such covenant could not restrain the authorities of Oakland from exercising their judgment in creating additional ferries, as in their opinion the public interest should require. In re Fay, 15 Pick. 252. But the contract between the town of Oakland and Carpentier, must be deemed a fraud upon the law, and a complete evasion of its policy and object. A public trust was confided to the authorities of Oakland, to be executed by them as agents of the public. It was not in their power to denude themselves of the trust. It was not their "common property," and, by the charter, could not be sold or disposed of. It was a public trust, to be exercised by them as agents of the community, which they could not discard so as to prevent their successors from establishing additional ferries required by the public convenience. By the contract they granted, sold, released, and conveyed to an individual, his successors and assigns, exclusively, for the space of twenty years, the right to keep and run a public ferry or ferries, so as to demand and receive compensation therefor, between the town of Oakland and the city of San Francisco, and between the said town and any other place, together with all and singular the ferry-rights, privileges, and franchises, which now are or may hereafter be held and owned by said town. By such contract the then authorities of Oakland attempted to convert a public trust to private and individual use, and to place for twenty years under the exclusive control of an individual and his assigns, all, even future, means of ferry communication across the navigable waters from Oakland to any other place. Such never was the intention of the legislature. Such an act, it was not in the power of the authorities of Oakland to do, and such a transaction a court of equity cannot sustain. This tribunal could not interpose by the extraordinary process of an injunction to support rights derived from such a source; and maintain a title, which so far from being free from doubt, was executed under a contract in fraud of the law under which it professes to be executed; and to sustain restrictions over the navigable waters of this state, which the legislature has declared shall be exempt from all such restrictions.

HOFFMAN, District Judge. The bill in this case is filed for an injunction to restrain the defendants from interfering with the privilege or franchise of the complainant in a ferry from the town of Oakland to this city, of which he claims to be the exclusive owner for a term of years. This franchise is alleged to have been conferred on the complainant by an ordinance, and contract pursuant thereto, made by the trustees of Oakland, in the year 185-. The authority of the trustees to make the ordinance and contract is derived from the act of the legislature passed May 4, 1852. Under the supposed authority of this act, a contract was made by the trustees, granting to the assignor of the complainant the privilege, claimed to be exclusive, of keeping and running all ferries between the town of Oakland and the city of San Francisco and elsewhere. It is not denied that the defendants are running a ferry-boat between this city and the town of San Antonio, touching at Oakland; nor that the profits and business of the complainants are seriously affected thereby. It is urged that the court should not at this stage of the cause, determine its whole merits, but that the injunction should be granted if the complainant has made out a prima-facie case. But it is well settled that injunctions will not be granted to secure the enjoyment of a statutory privilege, unless the right be clear. 3 Cow. 755; 1 Johns. Ch. 611.

In cases where an injunction is prayed to restrain an act which, if committed, will work irreparable mischief, it will be granted ex necessitate, even in doubtful cases, as the only means of keeping the parties in statu quo, and preventing the final decree from being abortive. Such are, the cases of the threatened destruction of heir-looms or works of art, or objects having a pretium affectionis —like family portraits, &c., or the publication of private letters, or the erecting of nuisances calculated to work irreparable mischief, &c. In all such cases, it is clear that if the court, by refusing the injunction, permits the act to be done, its subsequent decree granting the injunction would be but a brutum fulmen. But when an exclusive privilege under a statute is claimed, and the court is asked to forbid the commission of an act, otherwise lawful, because it interferes with the exclusive privilege claimed, the legal right of the complainant must be clear. It is said that in this case the court should interfere because the trespasses on the complainant are continuous and cannot be estimated in damages. But the damage to the defendants, if they are prevented from running their boat until their cause is heard, are equally unsusceptible of calculation, and may be far greater than the complainant can sustain by the competition. The court should therefore be fully satisfied that the right exists before, by its injunction, it will cause to the defendants an injury quite as irreparable, and perhaps more extensive, than that apprehended by the complainant.

The supposed authority of the trustees to make the ordinance and contract relied on by complainant, is contained in the third section

of the act to incorporate the town of Oakland, passed May 4th, 1854. This section provides "that the board of trustees shall have power to make such by-laws and ordinances as they may deem fit, proper, and necessary; to regulate, improve, sell, or otherwise dispose of the common property; to prevent and extinguish fires; to lay out, make, open, widen, regulate, and keep in repair, all streets, roads, bridges, ferries, public places and grounds, wharves, docks, piers, slips, sewers, wells, and alleys, and to authorize the construction of the same; and with a view to facilitate the construction of wharves, and other improvements, the lands lying within the limits aforesaid, between high tide and ship-channel, are hereby granted and released to said town." It is not claimed that the foregoing provisions constituted a grant to the town of Oakland, of all ferries from that town, as property. It is urged, however, that they amount to a delegation to the trustees of all the legislative and sovereign power possessed by the state over the subject of ferries from that town. That in the exercise of that power, the trustees could make any contract, and confer any rights with regard to ferries, they might deem proper, and that having done so, the rights thereby conferred, vested, and remain indefeasible, either by the trustees or the state, except in the exercise of the right of eminent domain.

The first question to be considered is, what were the nature and extent of the authority conferred upon the trustees by the act above cited? The only words in the clause which can be construed to confer the powers supposed, are the words "make" and "authorize the construction of." It is evident that most of the empowering words in the phrase do not apply to all the objects in reference to which the powers are to be exercised. For instance: the word "open" cannot refer to "ferries," nor the word "widen" to "wells." The words "lay out," evidently refer to "streets," "roads," "public places," and "grounds;" and the words "authorize the construction," have obviously a more specific reference to the docks, wharves, bridges, and sewers mentioned, than to the public places and grounds, or to the ferries. It is clear, therefore, that the various empowering words in the phrase must be construed distributively, reddendo singula singulis; and they must be distributed among the objects mentioned, in such a way as to give, with respect to each, only those powers which would naturally be conferred upon a municipal corporation, with reference to such objects. To apply the word "make" to "ferries," and to construe it as conferring the absolute right of leasing indefinitely, or granting the franchise for all ferries from the town to any individual, would seem a forced interpretation, suggested rather by the desire to find in the act the authority sought for, than by the natural construction of the phrase itself. If "make"

were the only word which could apply to ferries, or if "ferries" were the only word which would satisfy and give effect to the word "make," the construction contended for would be more plausible. But the word "regulate" not only can be applied to ferries, but it is sufficient to confer all the authority with respect to them, which would naturally and appropriately be given to a municipal corporation, from whom a grant of the franchise in property is withheld; while the word "make" has a similar operation if applied to the bridges, wharves, piers, docks, sewers, wells, &c. To make "ferries" is certainly an unusual and awkward expression. The more appropriate phrase would obviously be "to establish ferries;" and had the extensive powers with regard to them which are now claimed, been intended to be conferred, it is hardly possible that the legislature would have omitted in specific terms to grant and enumerate them. The construction contended for assumes that while the legislature withheld the grant of the franchise from the corporation as property, it nevertheless intended to give them full power to grant the exclusive franchise as property to any individual; to be assigned or sold by him at pleasure, and capable of being owned by a foreigner or a citizen of another state; and all this by the force of the word "make," which is wrested from its natural application to other objects, and made to refer to ferries by an ingenious and forced construction. The words "authorize the construction of" cannot be appealed to as conferring the powers attempted to be exercised in this case. Whatever propriety there might be in the phrase "construct a ferry," the power to do so can hardly be deemed a power to grant or lease an exclusive franchise and privilege of establishing it, especially when such franchise is not conferred upon the donee of the power to construct; and in this case the power is not given to "construct." but to "authorize the construction of ferries," if, indeed, it refers to ferries at all. It is, therefore, merely a power to permit, or to allow them to be constructed. It would surely be an unwarrantable latitude of construction, to hold that a power to permit the construction of a ferry, unaccompanied by a grant of the franchise, authorized the absolute grant of an exclusive franchise to any one the party empowered to permit might see fit to give it. But, for the reasons before assigned, I think the words "authorize the construction of" apply to wharves, docks, piers, bridges, &c., and not to ferries; with reference to which they are obviously inappropriate.

But assuming that the words "make" and "authorize the construction of" apply to ferries, the question recurs, whether the trustees were authorized by the power thus given, to confer the right now claimed. The ordinance under which the contract with Edward R. Carpentier was made, provides that "the trustees, &c., do hereby make, open, widen,

lay out, grant, create, ordain, establish, and regulate a public ferry between the said town of Oakland and the city of San Francisco, to be called the 'Oakland Ferry'; and they do hereby bargain and contract with Edward R. Carpentier, his heirs, agents, and assigns, to run said ferry for the period of twenty years, according to the terms of this ordinance, either as a separate ferry, or in connection with, or continuance of, the one already established and used between said town and said city, hereby granting, selling, and releasing and conveying to the said Carpentier, and to his successors in interest and assigns, exclusively, for the said period of twenty years, the right to keep and run a public ferry, or public ferries, so as to demand and receive compensation therefor, between the said town of Oakland and the city of San Francisco, or between the said town of Oakland and any other place; together with all and singular the ferry-rights, privileges, and franchises, which now are or may hereafter be owned by said town." The contract made in pursuance of this ordinance is in substantially the same language. Admitting that so much of this ordinance as purports to establish, create, and make a public ferry between Oakland and San Francisco is a valid exercise of the power conferred on the trustees, we are next to inquire whether the grant and the subsequent contract was also within the power of the trustees. It will be seen that the trustees in express terms convey and grant for twenty years, to Carpentier and his successors exclusively, the right of running and keeping a ferry or ferries between Oakland and San Francisco, and between Oakland and any other place, and they undertake to convey to him "all the ferry-rights, privileges, and franchises which now are or may hereafter be owned by said town." It is not contended that the town of Oakland was the owner of any exclusive ferry-franchise whatever. The grant, therefore, of the ferry-franchises owned by the town would, of course, pass for nothing. As to the grant of all ferry-franchises which might thereafter be owned by it, no observations are necessary; but it is said that the trustees, in the exercise of their power to establish ferries, had incidentally and as the appropriate means of establishing them, the right to release them to individuals. It is not necessary to inquire into the authority of the corporation to establish a particular ferry, and to lease it to an individual. The right they have attempted to convey to Carpentier was not a lease of a particular ferry between a certain point in the town of Oakland and the city of San Francisco, but the exclusive right to keep and run a ferry or ferries between Oakland or any other place. They thus abdicated and renounced the exercise of all the powers with respect to ferries with which they were entrusted, except that of "regulating." For the power to establish other ferries could be of no avail, so long as

Carpentier retained the exclusive right to run and keep them. It would perhaps be difficult to find, in the history of municipal corporations another instance of so extraordinary a grant. It was not only not an exercise of any power they may have possessed to establish ferries, but it was, in effect, the surrender of the whole power to establish them, and it amounted to an agreement that no ferry should be established from Oakland to any place whatever, unless by the permission of the person to whom they had given the exclusive right to run them. It seems to me that the legality of this grant cannot for a moment be supposed. The authority vested in the board was conferred upon them as trustees for the public, to be exercised for the public good. They had not only the right, but it was their duty, and that of their successors, to exercise the power of establishing ferries, as agents and trustees of the public, whenever the public good might require.

The power to establish ferries, if it existed at all, was a continuing power and duty, which existed in every board of trustees for the time being; and no covenant by one board not to exercise it, or for the exclusive enjoyment of the franchise by an individual, could prohibit or restrain their successors from exercising the powers vested in them by the statute to establish and license other ferries required by public convenience and necessity. In re Fay, 15 Pick. 243. But to ascertain more certainly the intention of the law, and the nature and extent of the powers conferred upon the trustees, the legislation of the state with regard to ferries must be considered. By the act of March, 1850 [Laws Cal. 1850–51, p. 758], all persons were forbidden to keep ferries without a license, except for their own use, or that of their families. The courts of sessions were empowered to establish ferries across bays, creeks, or sloughs, bounding or within their respective counties, as they might deem necessary, and were authorized to issue a license to keep a public ferry to any suitable person applying therefor, for a term not to exceed one year, on the fulfillment by the applicant of certain pre-requisites. They could also license and establish additional ferries within less than two miles from a regularly established ferry, when necessary for public convenience, and on notice to the proprietor of such previously established ferry. The act further provides for the establishment of ferries on private property, for the occupation of ground at either end of the ferry, and for the publication of a notice of the application for a ferry. It also prescribes the duties and privileges of ferrymen, and provides for the rates of ferriage, revoking licenses, and for the penalties to be imposed for a refusal to transport persons or property. All these provisions were of a general character, and applied to all the counties of the state. They were evidently designed to provide by general law for the establishment of ferries, for confer-

ring the franchise in suitable cases, with proper checks and securities, and, with the express reservation of the right to confer a similar franchise upon persons other than the proprietor of the first-established ferry, whenever it might be deemed necessary or advantageous to the public. The same provisions, in substance, remain as part of the general law of this state to the present day, except that it having been determined that under the constitution of this state the courts of sessions could not exercise the functions assigned to them by the act, the same powers, in substance, were, by the act of 1855, vested in the boards of supervisors.

On the 14th of April, 1853 [Laws 1850–53, p. 763], an act was passed, declaring that the 2d section of the act creating and regulating public ferries, should not be construed to apply to the bays of San Pablo, Suisun, San Francisco, or Monterey; and the navigation of said bays, and the transportation of freight or passengers over, across or through the same, was declared to be free and exempt from the restriction of any ferry-laws then in force in the state. These provisions have been repeated, in substance, in all the succeeding ferry-laws passed on the subject. It will not be disputed that these laws indicate and establish the settled policy of this state, with regard to public ferries: that it was intended to confer the franchise, for a limited time, on persons found to be suitable, and with certain privileges, checks, securities, and penalties, carefully provided by law; that such privileges were not to be exclusive, but other ferries could be established, contiguous to any established ferry, whenever deemed necessary; and that the state was to derive a revenue from the issuing of the licenses. The law of 1853, and subsequent enactments to the same effect, show that the great arms of the sea therein mentioned, were not regarded as fit for the establishment of any ferries whatever, but that their navigation and the transportation of freight and passengers, across, through, and over them, were to be left free and exempt from the restrictions of any ferry-laws in force in this state. Such being the settled policy and law of this state, with regard to public ferries, and with reference to the bays mentioned, it is not to be presumed, without the clearest evidence of a contrary intention, that the legislature intended to confer upon the trustees of a small town in the Bay of San Francisco, the power to grant an exclusive privilege to establish ferries across the most important of those bodies of water the navigation of which was, the next year, declared free and exempt from all ferry-laws.

If the general ferry-law, under which no exclusive rights could be acquired, nor licenses granted for more than a year, was deemed unfit to be applied to the Bay of San Francisco, the inference is irresistible, that it could not have been the intention only one year previously, to confer upon the

trustees of a town an unlimited power to grant exclusive privileges, for any period, with reference to the same waters, to any individual they might choose. It is admitted that the law by which the power claimed was conferred, might at any time have been repealed. Had the legislature, when, in 1853, it declared the bays mentioned to be exempt from the operation of all ferry-laws, and the navigation over and across them to be free, supposed that the trustees of Oakland were empowered to grant an exclusive right to an individual to establish ferries to the most important city of the state, they would surely not have omitted to revoke the powers, and repeal the law by which they were conferred.

The question we have been considering, is purely one of construction; and even if the language of the act were more doubtful, yet when read by the light of the previous and immediately subsequent legislation of the state, its true interpretation would seem to be unmistakable. But, it is said that the power to establish a ferry imports ex vi termini, a power to confer exclusive rights in the ferry so established; that without such rights it would not be a ferry in the legal sense of the term. But on this point, the case of Fanning v. Gregoire, 16 How. [57 U. S.] 524, is decisive. In that case, Fanning claimed under a direct grant from the legislature, authorizing him to keep a ferry at the town of Dubuque, across the Mississippi river, for the term of twenty years. This he accordingly established. Subsequently, the state conferred upon the city-council of Dubuque, power to license and establish public ferries across the Mississippi; and under the power a license was granted. On a suit by Fanning against the licensee, it was held that his franchise was not exclusive, but that the legislature had a right to license other ferries. It is clear that if a direct grant to an individual, of authority to establish and keep a ferry at a particular place does not vest in him an exclusive franchise, the grant to a municipal corporation of power to establish ferries does not authorize them to bestow exclusive privileges. If the term "ferry" in the grant to Fanning did not impart any exclusive franchise, it cannot have that meaning in the act incorporating Oakland. It can surely make no difference whether the state is supposed to have duly surrendered to an individual its power of improvement and accommodation in a great and important line of public travel, or whether it is supposed to have authorized a municipal corporation to surrender it; in either case "its abandonment ought not to be presumed, where the deliberate purpose of the state to abandon it does not appear." [Charles River Bridge v. Warren Bridge] 11 Pet. [26 U. S.] 549.

It is urged that, even if the town of Oakland or the state had power to license other ferries, yet the right of complainant to the exclusive enjoyment of the ferry on the par-

ticular ferry-ways established by him ought to be protected. But in the case above referred to, no such distinction appears to have been taken. The right claimed was, like this,—an exclusive right to run a ferry from a certain town across the Mississippi for twenty years. The infringement complained of was the licensing and establishment of another from the same town across the same river. The court decided that the franchise claimed was not exclusive, and that the establishment of the second ferry was legal. It is nowhere suggested that the second licensee could not run his boat from any part of the town of Dubuque, and even from the same wharf as that used by the first licensee. 2dly. The privilege attempted to be granted in this case, was not the privilege of keeping and running a ferry from any specified dock or wharf in the town of Oakland to any other point across the bay. It was the right to keep and run a ferry or ferries from the town of Oakland generally to any place whatever. Whether, if the trustees had established a ferry from a certain wharf, and leased the same to an individual, his rights in such ferry would have been exclusive, it is not necessary to inquire; for the right granted was the exclusive right to run "a ferry or ferries" from the town of Oakland to any place, with all the ferry-rights, privileges, and franchises then owned or thereafter to be owned by the town.

· But admitting, for the sake of argument, not only that the trustees were empowered to establish ferries, but that the legislature intended to confer upon them powers to grant to an individual the exclusive franchise for any period, of running and keeping the ferries so established, such a construction affords an argument almost irresistible, that those powers could only have been conferred with regard to ferries wholly within the corporate limits. Within those limits is the creek San Antonio, which can only be crossed by bridges or boats. If, then, the power to grant the franchise in property was intended to be conferred, it is surely more reasonable, and more in accordance with every rule relating to the construction of grants of this description, to construe it as referring to ferries across waters wholly within the corporate limits, than to suppose it to extend to ferries across a bay the navigation of which was, in less than a year afterwards, declared free and open to all. With reference to the streets, docks, wharves, and sewers, this limitation is necessarily understood. Why not with regard to ferries, if the power to grant the franchise was intended to be given? The ferry from Oakland to this city affords the principal, if not the only means of convenient access to the commercial centre and chief seaport of the state, not only to the citizens of Oakland, but to the inhabitants of a considerable district; and the possession of an exclusive franchise of running and keeping all ferries between Oakland and this city, gives to the possessor the practical control of the means of communication. Can it be supposed that the legislature intended to give the power to grant such a right to the corporate authorities of a town situated at one terminus of the ferry, and to take away or render nugatory the rights of the county at the other terminus to license ferries across the water forming their common boundary? That this right existed in both counties under the law of 1851, is clear. But the privileges conferred by the license under the ferry-laws, are limited, and not exclusive in the person obtaining the license. To suppose then that the power contended for was conferred upon the trustees of Oakland, we must suppose that the powers given to every county on the Bay of San Francisco, between which and Oakland a ferry might be established, were revoked and the general ferry-laws on that subject repealed by implication. And this by force of the word "make," which we are asked first to apply to ferries, and then to construe as has been explained. It may be said that the question is not now as to the right of other counties to license ferries under the general ferry-laws. This is true. But the question is as to the exclusive right of the complainant to a ferry between Oakland and this city—as against the defendants; and in construing the law under which his alleged rights are claimed, it is of importance to show that the power to confer such rights was incompatible with the then existing laws conferring powers over ferries to other counties, and could only have been given by repealing pro tanto those laws; as also that it was incompatible with subsequent laws, by which all power to establish ferries over the waters in question was taken away. It has not seemed to me necessary to refer on this point to the general rules relating to the construction of grants of this kind. It is not denied that grants of privileges, franchises, etc., are to be strictly construed, and that nothing is to be taken by intendment. It is claimed, however, that this is a delegation of legislative authority, and not a grant of a franchise, and that therefore a different rule must be applied. I confess myself unable to see the propriety of this distinction in the present case. The state is the sovereign from whom the power is derived, whether it is supposed to have granted directly to a corporation the exclusive franchise as property, as was done in the case of the city of New York, or to have granted to the corporation power to make an exclusive grant of the franchise to an individual; in either case, the rules of construction must be the same. It can surely make no difference whether the corporation is the direct grantee of the franchise, or the donee of a power to make a grant of it and receive the consideration.

Many other questions were raised and argued at the hearing, which it is unnecessary to discuss. On the whole, I think, 1st. That

it is at least doubtful whether the act incorporating the town of Oakland, gave to the trustees any other power with regard to ferries than that of regulating them. 2d. That if the power to establish ferries was conferred, such power was held by them as a public trust, to be exercised by them and their successors when the public good might require. They had, therefore, no authority to confer upon any individual the exclusive right to keep and run a ferry or ferries, between Oakland and San Francisco, still less such a right with regard to ferries "between Oakland and any other place." 3d. That if such powers were intended to be given the trustees, they could only have referred to ferries across waters wholly within the corporate limits of the town. 4th. That under any possible view of the case, the right of the complainant is doubtful; and that, therefore, the injunction ought not now to be granted.

[The decree in this case was affirmed in the supreme court upon appeal. 23 How. (64 U. S.) 435.]